IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                                                 )<br>)<br>STEPHEN WAYNE PURKS                  ) | Criminal Action No. 5:21-cr-00007-3<br><br>By:  Elizabeth K. Dillon<br>       United States District Judge |

**MEMORANDUM OPINION AND ORDER**

Pursuant to a second superseding indictment, defendant Stephen Wayne Purks faces 15 charges related to the possession and distribution of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a).  (*See* Dkt. No. 145.)  This case is set for a two-week jury trial beginning on January 30, 2023.

Pending before the court is Purks' motion to suppress (Dkt. No. 265).  He asks the court to suppress statements he allegedly made to law enforcement agents during a May 13, 2021 interview in a Florida prison, arguing that the interview was a custodial interrogation and that his alleged statements were made involuntarily and after he had invoked his Fifth Amendment right to counsel.  The government responds in opposition (Dkt. No. 286) that Purks was not subjected to a custodial interrogation—and thus did not have a right to counsel—and that any statements he made were voluntary.  The court held a hearing on the motion to suppress on June 29, 2022, at which the court heard testimony both from Purks and from Special Agent (SA) Thomas Hickey of the Drug Enforcement Administration (DEA), who interviewed Purks at the prison.

For the reasons stated herein, the court will deny Purks' motion.

I.   BACKGROUND

On April 28, 2021, Purks was indicted on charges of conspiracy to distribute

methamphetamine and distribution of methamphetamine. (Dkt. No. 13.)¹ At that time, Purks was incarcerated at the Florida Department of Corrections' (DOC) Desoto Annex on unrelated state charges. (Hr. Tr. 3:16–17.)

On or around May 11, 2021, SA Hickey called a Florida DOC investigator at Desoto Annex to coordinate a trip to visit Purks. (*Id.* 4:14–20.) SA Hickey also informed the Florida DOC investigator that the federal government believed Purks had a contraband cellphone on his person at the prison that he was concealing in his "rectal areas." (*Id.* 5:1–6.) At the time, the federal government had been communicating with Purks through a confidential informant to purchase methamphetamine. (*Id.* 5:8–9.) SA Hickey asked the investigator to "see if he could acquire the cell phone" (*Id.* 5:17–18) because the federal agents wanted "to corroborate the evidence that [they] had gone back and forth with [] Purks" about purchasing methamphetamine. (*Id.* 5:9–14.) SA Hickey testified that he did not ask the investigator to administer any discipline or beatings on Purks. (*Id.* 24:1–4.)

Purks testified that, at some point after SA Hickey's phone call with the investigator, he was removed from his cell and beaten by DOC officers, who slammed him against a gate and then the ground. (*Id.* 33:1–3.) According to Purks, the officers stated that "they knew [Purks] had a phone" and "to give it to them." (*Id.* 33:5–6.) Purks told the officers that he "didn't have a phone." (*Id.* 33:6–7.)² The DOC officers continued to beat him until he relented, saying "you can have the phone. You can have it." (*Id.* 33:7–12.) Purks also testified that, because of this encounter, he experienced back spasms and had to use a wheelchair. (*Id.* 32:18–25; 33:14–15.)

---

¹ The currently operative second superseding indictment was filed on October 13, 2021. (Dkt. No. 145.)

² Purks attempted to clarify later in the hearing that he was not denying having a phone in the prison, but rather was trying to say that the phone "wasn't [] inside me," referring to his rectum. (Hr. Tr. 33:16.) According to Purks, "when [the officers] were stomping me and all that, they were assuming the phone was inside me. That's why they were doing it . . . . I guess they were assuming if they stomped on my back I would go to the bathroom on myself or something." (*Id.* 33:18–34:3.)

2

On May 13, 2021, SA Hickey, Frederick County Sheriff's Office Sergeant Travis Medina, and DEA Analyst Carol Dillon interviewed Purks at the Desoto Annex. DOC officers retrieved Purks from his cell, handcuffed and shackled him, provided him a wheelchair, and wheeled him to the "administration" area of the prison. (*Id.* 34:8–19.) Purks testified that he was not informed of where he was being taken and attempted to refuse to go. (*Id.* 34:8–11; 35:1–6.) He was placed in an office space where SA Hickey, Sgt. Medina, and Dillon joined him. (*Id.* 6:15–18.) SA Hickey testified that there was not a video camera or observational glass in the office, no DOC officers outside of the door, and no other indication that anyone was observing the interview other than the individuals in the room. (*Id.* 6:25–7:9.) SA Hickey testified that the door was closed but not locked from the inside—that is, it could be opened and closed without third-party authorization. (*Id.* 27:20–28:1.) SA Hickey observed that Purks was "slumped over" in the wheelchair, but he did not observe any physical injuries to him. (*Id.* 7:23–25.) Indeed, Purks testified that any pain he was experiencing did not prevent him from understanding what was going on during the interview. (*Id.* 46:21–23.)

SA Hickey initiated the conversation by providing his name and badge and informing Purks that he had been indicted in the Western District of Virginia on methamphetamine-related charges. (*Id.* 8:22–25.) Purks testified that the first thing he said when he entered the interview was, "[O]h, so you're the one that put them up to this," referring to his earlier beating by the DOC officers to retrieve the cell phone. (*Id.* 40:5–12.) According to Purks, SA Hickey "didn't deny it," instead saying "[W]ell, you shouldn't have a phone in prison." [3] (*Id.* 40:13–17.)

SA Hickey then described the process of extradition, initial appearance, and arraignment. (*Id.* 9:1–12.) As SA Hickey described these preliminary matters, Purks denied that he was

---

[3] SA Hickey did not recall this exchange, noting "I feel like I would have [recalled] if I was accused of that." (Hr. Tr. 25:23–26:4.)

involved in methamphetamine distribution. (*Id.* 10:11–14.) SA Hickey replied that he had seen pictures on Purks' Facebook page full of methamphetamine, that he had seen pictures of methamphetamine Purks had sent to his daughter and one of his co-defendants, April Mosely, and that the agents had bought methamphetamine from Purks since January of that year. (*Id.* 10:14–20.) SA Hickey testified that, once he shared this information, Purks "started laughing and saying, [']okay, you got me.[']" (*Id.* 10:21–11:7.) SA Hickey and Purks were "joking back and forth about what [Purks] was sending on his Facebook" and having a "cordial conversation." (*Id.* 11:3–8.) Up to that point, SA Hickey had not asked Purks any questions (*Id.* 11:9–12.)

According to SA Hickey, the agents had traveled to Florida "basically just to let [Purks] know that he was indicted" and "to recover the cell phone." (*Id.* 12:18–22, 25:7–8.) But after discussing the Facebook page and the cell phone, SA Hickey then told Purks, "I do want to talk to you because I know you have information that can help us." (*Id.* 12:14–17.) Up until this point, SA Hickey "really had no idea that [Purks] was going to sit down and talk to us." (*Id.* 20–22.) Purks expressed that he was interested in talking, clarifying that "I'll answer it if I think I can answer it." (*Id.* 35:21–22.) SA Hickey then provided him with standard *Miranda* warnings—including the right to have counsel present—from a card he kept in his wallet. (*Id.* 12:25–13:1, 15:4–11.) SA Hickey confirmed that Purks understood the warnings and was willing to answer questions. (*Id.* 14:10–15:1.)

Purks testified that, after receiving *Miranda* warnings, the two began a back-and-forth conversation in which SA Hickey asked him questions Purks considered incriminating. For example, SA Hickey asked Purks, "so who's your best customer?" (*Id.* 35:23–25.) Purks responded that he "can't answer that. You're trying to make me incriminate myself, you know." (*Id.* 35:25–36:2.) Purks testified that he declined to answer questions about his co-defendants

4

and would not talk about the girls who were allegedly working for him. (*Id.* 17:19–18:1, 36:2–4.)[4] SA Hickey proposed that they instead "speak hypothetically." (*Id.* 36:4–5.)

Purks testified that, after being asked to speak hypothetically about dealings (which was about a minute and a half after he received *Miranda* warnings), he asked for an attorney. He told SA Hickey, "I tried to answer your questions, but I'm not going to incriminate myself or someone else." (*Id.* 36:18–21; 39:3–4.) On the other hand, SA Hickey testified that Purks never requested an attorney or asked to stop the interview. (*Id.* 18:2–7.)

SA Hickey testified that the interview lasted an hour or less. He described Purks as "cordial," "giddy," "laughing," and "smiling" during the interview. Purks testified that the agents were "respectful," and "were in there trying to act like they're my friends and things of that nature." (*Id.* 39:11–12; 45:7–18.) Purks testified that he was a "smart aleck" in responding to the agents at times. (*Id.* 57:9–10.) At no point in the conversation were there any threats, yelling, or cursing. At the conclusion of the interview, Purks expressed interest in cooperating with the United States, and SA Hickey suggested that he let his counsel know, once he arrives in Virginia, that he wants to continue cooperation. (*Id.* 19:2–6.) SA Hickey then walked out of the room, went down the hall, and informed a correctional officer that the conversation was over; the officer came into the room and wheeled Purks out. (*Id.* 22:7–11.) The agents then retrieved Purks' cell phone. (*Id.* 22:22–25.)

At the hearing, on cross-examination, counsel for the government also questioned Purks about his several other drug and firearms convictions. (*See id.* 40:24–42:20.)

## II. LEGAL STANDARDS

Motions to suppress are decided by the court, not the jury. *United States v. Stevenson*,

---

[4] SA Hickey did testify that Purks was willing to talk about some of the co-defendants, but he did not specify what, if anything, was said. (Hr. Tr. 17:24–18:1.)

5

396 F.3d 538, 541 (4th Cir. 2005). The district court is empowered to make findings of fact, and conclusions of law. *Id.* "'At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" *United States v. Ramirez-Solis*, 518 F. Supp. 3d 896, 906 (W.D. Va. 2021) (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993)). Generally, "the burden of proof is on the defendant who seeks to suppress the evidence. Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (W.D. Va. 2016) (internal citations omitted) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981); *United States v. Matlock*, 415 U.S. 164, 177–78 n.14 (1974)).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. V. To safeguard this right, the Supreme Court adopted a series of procedural rules that must be followed during custodial interrogations in *Miranda v. Arizona*, 384 U.S. 436 (1966). One such safeguard recognized in *Miranda* is that the police must advise a suspect of his right to counsel, and "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present," unless "the accused himself initiates further communication, exchanges, or conversations with the police." *Miranda*, 384 U.S. at 474; *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Statements made during a custodial interrogation[5] "will be suppressed unless police advise the defendant of his rights under *Miranda*[,] . . . and the defendant knowingly, intelligently, and voluntarily waives those rights." *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017).

---

[5] Generally, "[a] suspect is 'in custody' for *Miranda* purposes if the suspect has been formally arrested or if he is questioned under circumstances in which his freedom of action is curtailed 'of the degree associated with a formal arrest.'" *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam)).

6

But "[t]he requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444 (2000). "A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). The test for identifying whether a statement is involuntary is to determine whether the statement was "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (internal quotations omitted). Before a statement can be deemed involuntary, there must be some showing of "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *Braxton*, 112 F.3d at 780. Instead, the crux of the voluntariness inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton*, 835 F.2d 1067, 1071–72 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). In conducting this inquiry, a court should look to "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* (internal quotations omitted).

### III. ANALYSIS

**A. *Miranda* Violation**

Purks' argument that his statements were obtained in violation of *Miranda* are rejected for two reasons. First, Purks was not in custody for purposes of *Miranda*. The Supreme Court has held, in circumstances similar to those presented here, that taking a prisoner aside for questioning about criminal activity that occurred outside the prison does not necessarily convert

7

a noncustodial situation into a custodial one to which *Miranda* applies. *See Howes v. Fields*, 565 U.S. 499, 502 (2012). In *Howes*, an inmate serving a sentence in a Michigan jail was escorted by a corrections officer to a conference room and questioned by two deputy sheriffs about allegations that, before he came to prison, he had engaged in sexual conduct with a 12–year–old boy. *Id*. The deputy sheriffs questioned the inmate without first providing *Miranda* warnings. *Id*. at 504. The Court concluded that the inmate was not in custody for purposes of *Miranda*, reasoning that the circumstances of an interview in prison, do not, in and of themselves, establish that an inmate is in custody under *Miranda*. Rather, the Court added, the determination "should focus on all of the features of the interrogation," including the presence or absence of physical restraints during the questioning, the duration and location of the interview, the release of the interviewee at the conclusion of the discussion, and statements made during the interview itself. *Id.* at 509.

Here, like in *Howes*, Purks "did not invite the interview or consent to it in advance, and he was not advised that he was free to decline to speak with the [agents]." *See id.* at 514. But there is no dispute that, as was true in *Howes*, the federal agents did not physically restrain or threaten Purks. *See id.* at 515. The agents here were not armed and the tone of their conversation with Purks was by and large respectful (unlike in *Howes*, where the deputies were armed and one had used "a very sharp tone" and "on one occasion, profanity.") *Id*. Although Purks, as an inmate, was not free to leave the conference room by himself and make his own way through the jail to his cell, he "would have been subject to this same restraint even if he had been taken to the conference room for some reason other than police questioning; under no circumstances could he have reasonably expected to be able to roam free." *See id.* at 515–16. He was still free to end the conversation and have a correctional officer return him to his cell.

These facts, taken together, "are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave," not a custodial interrogation to which *Miranda* applies. *See id.* at 515 (citation and quotations omitted).

Additionally, even assuming that Purks was in custody for purposes of *Miranda*, the court credits SA Hickey's unequivocal testimony that Purks never asked for a lawyer over Purks' testimony that he did invoke a right to counsel. The question of whether Purks asked for a lawyer or otherwise invoked a right to counsel is one of the few aspects of the interview which Purks and SA Hickey recalled differently; otherwise, Purks seemed to largely agree with SA Hickey's characterization of the tone of the conversation, the topics discussed, and the other intervening details. Moreover, on cross-examination at the hearing, the government impeached Purks' credibility not only by eliciting an admission that he had a contraband cell phone in the prison, but also by introducing evidence of five prior drug and firearms convictions.

All in all, the court finds that Purks was not in custody for purposes of *Miranda* and that, even if he was, he did not invoke a right to counsel.

**B. Voluntariness of Statements**

Purks argues that the statements he made to the federal agents were not voluntary and were the product of "actual physical coercion or the perceived threat of additional physical injury." (Dkt. No. 265, at 3.) According to Purks, the federal agents had arranged for him to be beaten by the DOC officers, and although that alleged beating was not contemporaneous with his conversation with the federal agents, he argues that the prior beating and resulting injuries "served to overbear [his] will and cause him to submit to questioning." (*Id.*)

The court disagrees. First, the totality of the circumstances indicates that the conversation itself was voluntary, respectful, and at times even friendly. Purks is not new to

9

interactions with the criminal justice system and related police interactions, given his multiple prior convictions. More specific to this interview, before asking any substantive questions, SA Hickey asked Purks if he was willing to answer questions, to which he said he was. SA Hickey then read Purks his *Miranda* warnings, and Purks responded to each warning indicating he understood and was willing to answer questions. At no point during the conversation did the agents touch, yell at, or threaten him. *See, e.g.*, *United States v. Holmes*, 670 F.3d 586, 593 (4th Cir. 2012) (finding no coercion where officers made no threats or promises). Purks even admitted that he gave "smart alecky" answers to the federal agents (Hr. Tr. 58:17–25) and was laughing and smiling (*id.* 11:1, 18:22–23) at times during the interview, hardly consistent with someone who so deeply feared that the agents would cause him future harm that his will was overborne or capacity for self-determination critically impaired.

Further, even assuming the truth of Purks' testimony regarding the beating he allegedly endured two days before the meeting, the evidence does not demonstrate that the federal agents ordered that beating or otherwise coerced Purks to answer their questions under threat of a future beating. Purks' only explanation to connect the federal government to the alleged beating by inference was that SA Hickey apparently "didn't deny it" when accused of arranging for the correctional officers to beat up Purks—instead saying "well, you shouldn't have a phone in prison." (*Id*. 40:5–17.) SA Hickey testified that the federal government had reason to believe Purks was hiding a contraband cell phone in his rectal area and that he had asked the Florida DOC to retrieve it from him. He did not ask that the cell phone be taken by force, nor does the evidence support a finding that the federal agents even knew Purks was allegedly beaten until he told them at the interview. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause," *Connelly*, 479

U.S. at 167, and the record does not support a finding that the federal agents engaged in coercive activity.

In sum, Purks was not coerced, and his will was not overborne; his statements to the federal agents were voluntary within the meaning of the Fifth Amendment.

## IV.  CONCLUSION

For the reasons stated herein, it is ORDERED that Purks' motion to suppress (Dkt. No. 265) is DENIED.

Entered: January 11, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge